**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No. 1:23-cr-434 (TSC)** |
| | : | |
| **ANTHONY MASTANDUNO,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that the Court sentence Anthony Mastanduno to 72 months of incarceration, at the mid-range of the applicable Sentencing Guidelines range; three years of supervised release; $2,000 in restitution; and a $630 mandatory special assessment.

## I.    INTRODUCTION

The defendant, Anthony Mastanduno, participated in some of the worst violence inflicted upon law enforcement officers at the Lower West Terrace Tunnel during the assault on the United States Capitol on January 6, 2021. Mastanduno not only witnessed violence inside the U.S. Capitol Building, but after exiting, he chose to remain on Capitol grounds, where he participated in a vicious, hours-long attack on police defending the tunnel. The riot forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in

more than 2.9 million dollars in losses.[1]

Mastanduno, a 61-year-old man, arrived at the U.S. Capitol on January 6, 2021 wearing a "Veterans for Trump" hat, goggles, and a painter's mask. After aiding rioters who assaulted police on the Northwest Steps, Mastanduno was one of the first rioters to enter the Capitol Building, where he spent over 20 minutes inside. He was among the mob that overwhelmed police officers defending the Crypt.

Nearly two hours later by a tunnel entrance to the Lower West Terrace ("LWT"), Mastanduno watched nearby as other rioters attacked the police, including by dragging officers out of the tunnel. Mastanduno then joined in the violence, launching a flagpole javelin-style into the mouth of the tunnel, which he knew was full of uniformed police officers. He used a stolen police riot shield to push against the front line of officers defending that space, and repeatedly struck the officers with a telescoping baton.

The government recommends that the Court sentence Mastanduno to 72 months of incarceration. A 72-month sentence reflects the gravity of Mastaundno's conduct, but also acknowledges his prompt acceptance of responsibility, his military service, and his lack of a criminal history.

---

[1]   As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.     FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers the Court to the Statement of Offense in this case, ECF 1, for a summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.      Mastanduno's Role in the January 6, 2021 Attack on the Capitol

####   i.   _Mastanduno's Entry into the Capitol Building_

On January 6, 2021, Mastanduno was wearing a red "Trump 2020 Keep America Great!" baseball cap with a patch on the bill; half of the patch depicted an American flag, while the other half depicted the Marine Corps emblem. Mastanduno also wore gloves, a military-style camouflage jacket and a backpack. At times, he also donned large, clear goggles with a black elastic strap, and a blue painter's face mask.



_Images 1 and 2: Mastanduno, wearing a red baseball hat with a patch, and later wearing plastic goggles and blue face mask._

Mastanduno was among the rioters who amassed near the Northwest Steps to the Upper West Terrace at around 2:00 p.m., as other rioters assaulted officers and attempted to proceed toward the Capitol Building. Mastanduno was nearby as individuals assaulted officers in and around scaffolding that was erected in preparation for the inauguration of President Biden. At around that time, Mastanduno helped another rioter, Ronald Alfred Bryan, who had just engaged in two separate assaults on USCP officers,[2] decontaminate from the effects of pepper spray.



*Image 3: Mastanduno, wearing a red baseball hat with patch,*
*assisting Ronald Bryan after he had been pepper sprayed on the Northwest Steps.*

Mastanduno entered the U.S. Capitol Building through the Senate Wing Door at around 2:17 p.m., approximately four minutes after it was first breached by rioters who smashed windows

---

[2] Ronald Bryan has been separately charged for his conduct on January 6, 2021. *See United States v. Bryan*, 23-cr-387 (TJK), ECF 1-1.

and climbed in through them. In a likely effort to shield his identity, Mastanduno pulled his goggles over his face immediately after he entered the building.



*Images 4 and 5 (Ex. 1, timecode 00:57): Mastanduno, wearing a red baseball hat with a patch, entered the Capitol through the Senate Wing Door and promptly pulled up his mask to shield his identity.*

Approximately five minutes later, around 2:21 p.m., Mastanduno was at the front of a line of rioters who overwhelmed and overran police officers in the Crypt. As rioters became more agitated and appeared to be preparing to break through the police line, Mastanduno prepared by adjusting his goggles in place over his eyes.

5





*Images 6, 7, and 8 (Ex. 2): Mastanduno, circled in red, was at the front of the mob as the mob prepared to charge the police line; he fixed his goggles as other rioters near him, identified by yellow arrow, throw water bottles at the police line.*

Testifying in the trial of another participant in the events of the January 6, 2021 riot, one

USCP Lieutenant who was present for the confrontation in the Crypt described his experience as

follows:

Q.     And what happened when you got into the crypt?

A.     Rioters already entered the building on the Senate side and were on the hallway on the – the north hallway coming towards the Crypt.

Q.     Did you try to stop rioters in that location?

A.     Yes. As they came down the hallway . . . we formed a police line, me and the other officers that were there formed a police line in the crypt to try to keep them from going any further.

  . . .

There was a lot of yelling, screaming. Things were thrown at us. Eventually the mob pushed through the line, pushed people back. I was pushed into the hall and crushed into the wall to the point I couldn't breathe.

Q.     Were you scared?

A.     Yes.

Q.     What was going through your mind at that point?

A.     That my kids would be growing up without me.[3]

While inside the Capitol, Mastanduno also wandered the halls and stopped for at least one photograph, shown below, where he posed next to a bust of Václav Havel on which rioters had placed a red "Make America Great Again" hat.



*Image 9 (Ex. 3): Mastanduno, circled in red, posed for photograph next to Václav Havel bust.*

---

[3]  *See United States v. Carpenter*, 21-cr-305 (JEB), Trial Tr. at 190:19-191:2, 192:23-193:9.

Mastanduno assisted an apparently injured rioter and both left the Capitol Building at around 2:38 p.m.

> ii.     *Mastanduno's Civil Disorder and Assaults on Law Enforcement in the LWT Area*

After exiting the Building, Mastanduno remained on Capitol grounds and eventually made his way to the Capitol's Lower West Terrace. He proceeded to the mouth of the LWT—the location of the most violent episodes of the January 6 attack—where he watched and/or participated in the violence for hours.

Beginning at approximately 2:42 p.m., numerous rioters attacked members of the USCP and MPD who were defending an entrance to the Capitol on the LWT. Over the course of more than two hours, members of the mob threw items at police, struck police with objects, sprayed police with chemical irritants, pushed against the police, dragged uniformed officers into the crowd, and stole items from the police defending the small tunnel leading to the entrance.

Mastanduno joined in the violence around 4:25 p.m. First, Mastanduno watched intently as the mob viciously fought officers at the mouth of the tunnel, including as one rioter used an ice hockey stick to repeatedly beat officers.



*Image 10 (Ex. 4, timecode: 2:34): Mastanduno, circled in red, watched at the mouth of tunnel as other rioters viscously beat police, including with an ice hockey stick (circled in yellow).*

Mastanduno continued watching, undeterred, even as one MPD officer was violently dragged out of the tunnel and down the small set of concrete steps leading to the tunnel. As the officer was being dragged down the stairs, Mastanduno leaned over the stair's railing for a better look. Mastanduno was captured in the officer's body-worn camera leaning over the railing, looking at the officer. At that time, rioter Ronald Colton McAbee,[4] who was wearing body armor with "Sheriff" and "Three Percenter" patches affixed to his vest, was on top of the MPD officer, pushing him down and yelling as the officer was struggling to get up.

Below are screenshots from footage of this incident.

---

[4] Ronald McAbee has been separately charged and convicted for his conduct on January 6, 2021. *See United States v. McAbee*, 21-cr-35 (RC).





*Images 11, 12 (Ex. 5, Ex. 4, timecode: 3:10 – 3:14): Top – View from above as Mastanduno,*
*circled in red, watched as a MPD officer was dragged out of tunnel;*
*Bottom – Mastanduno leaned over a railing to take a look at officer on the ground.*

Below is a screenshot from MPD Officer A.W.'s body-worn camera footage of this incident.



*Image 13 (Ex. 6 (A.W. BWC)): Mastanduno, circled in red, leaned over and watched as an MPD officer was dragged out of the tunnel; Ronald McAbee, who was wearing body armor with "Sheriff" and "Three Percenter" patches affixed to his vest, pushed the MPD police officer down and yelled as the officer struggled to get up.*

Over the next two to three minutes, as the violence continued around him, Mastanduno ascended the stairs to get closer to the police line. As he did so, he picked up a stolen police riot shield. By 4:30:21 p.m., Mastanduno was close to the line of officers defending the mouth of the tunnel. He held the riot shield with both hands, and simultaneously held a telescoping baton in his right hand. Below are screenshots from Capitol surveillance ("CCTV") footage of this moment.

11





*Images 14, 15, 16 (Ex. 7): Mastanduno, circled in red, appeared front and center before the line of officers at the mouth of the LWT; he held a stolen police riot shield and telescoping baton as he prepared to engage.*

Below are screenshots from MPD body-worn camera footage from around the same time.





*Images 17, 18 (Ex. 8 (S.S. BWC)):Mastanduno, circled in red in top screenshot, held a stolen police riot shield in both hands; he also held a telescoping baton in his right hand.*

The lower right corner of the above body-worn camera screenshot also depicts another

tragic scene that was unfolding in front of Mastanduno as he approached the line of officers in the

13

LWT. The violence had momentarily ceased because another rioter at the mouth of the tunnel became unresponsive and later died as a result of accidental acute amphetamine intoxication.[5] That rioter had been on the ground in the tunnel directly in front of the line of police, but was pulled out by other rioters, who attempted to resuscitate her. *See* Screenshot from Ex. 8, above.

### Count Two - Assault on Officer T.C. with Flagpole

Mastanduno capitalized on the momentary lull in violence. At 4:30:31 p.m., he removed one hand from the police shield he was still holding, bent down, and picked up a blue flagpole-like object, which he then launched javelin-style into the line of police officers. The object made contact with MPD Officer T.C. Below is a screenshot from a video of that moment.



*Image 19 (Ex. 9): Mastanduno, circled in red, launched a blue flagpole javelin-style into group of officers defending the tunnel.*

---

[5] *See* "D.C. medical examiner releases cause of death for four people who died during Capitol riot," available at https://www.washingtonpost.com/local/public-safety/trump-riot-death-medical-exainer/2021/04/07/53806608-97cf-11eb-a6d0-13d207aadb78_story.html.

Below are screenshots from MPD body-worn camera ("BWC") footage of Mastanduno's flagpole assault. In it, the flagpole can be seen and heard making contact with the police line. Not only did the pole appear to brush the hand of MPD Officer S.S. after Mastanduno threw it, but it also made direct contact with Officer T.C.'s police shield, as Officer T.C. stood to Officer S.S.'s right. Notably, Officer T.C.'s BWC shows that a fellow officer to his left, believed to be Officer T.J., did not, at the time, appear to be wearing his police helmet and was instead holding the helmet in his hands. Mastanduno was not deterred by that officer's additional vulnerability.







*Images 20 - 22 (Ex. 8 (S.S. BWC); Ex. 10 (T.C. BWC)): Mastanduno, circled in red, bent down to pick up blue flagpole; he then launched it towards line of police, where it made contact with the Officer T.C. and appeared to brush the hand of Officer S.S..*

The flagpole launch is also captured on CCTV.



*Image 23 (Ex. 7): Mastanduno (circled in red) mid-throw.*

As a result of the events in the tunnel, Officer T.C. suffered and continues to suffer extreme mental anguish, noting these events were "horrific" and "life-changing." *See* Attachment 1 (Redacted Victim Impact Statement). After January 6, the officer missed several weeks of work and was forced to used additional leave to recover. Still today, once or twice per month, Officer T.C. has "memories of th[e] vicious event," resulting in difficulty sleeping and difficulty trusting others. He considers January 6 to be "forever [his] [d]arkest day."

17

**Count Three - Assaults on Officer Line[6] with Telescoping Baton**

Approximately 20 seconds after Mastanduno assaulted officers with the flagpole, the unresponsive rioter was brought back to the police line. The police pulled the unresponsive rioter back into the tunnel and eventually into the Building to attempt to save her. Again, this tragic scene transpired directly in front of Mastanduno, who, at one point, turned towards the mob and put up his hand to try to stop their barrage in order to allow the police to bring the female rioter to safety. *See generally* Ex. 7 (CCTV Lower W Terrace Door at 4:30:31 p.m. to 4:31:19 p.m.); Ex. 8 (S.S. BWC, approx. 16:30:30); 10 (T.C. BWC, approx. 16:30:30). During this time, Mastanduno could see and hear rioters screaming at the police and blaming them for the tragedy.

None of this violence deterred Mastanduno. Instead, within the next minute, Mastanduno had made his way to the very front of the mob and squared off with the police line. He held the police riot shield in his left hand and began attempting to strike officers with the telescoping baton in his right hand. In response to this renewed barrage of assaults from Mastanduno and other rioters beside him, the police line was shifting, rendering it difficult to determine the exact victim-officers whom Mastanduno attacked. Below are screenshots from CCTV footage of these moments.

---

[6] By this time, MPD Officer T.C. had stepped back from the front of the group of officers protecting the tunnel. Upon information and belief, the victims of Mastanduno's baton strikes may include the following MPD officers: J.C., M.D. (*see* Ex. 11, BWC), T.J., L.M., S.S., J.S. (*see* Ex. 12, BWC), and A.W.



*Image 24 (Zoomed in, Ex. 6): Mastanduno, circled in red, squared off with police line, holding the police riot shield in his left hand and the baton in his right.*

Mastanduno hit the line of officers multiple times with the baton. While doing so, he reached over the top of one of the officer's police riots shields in an attempt to strike the officer's head, as shown below.



*Image 25 (Zoomed in, Ex. 6): Mastanduno raised his hand and struck a second line officer's riot shield, while attempting to reach over to hit that officer's head. Then, Mastanduno raised his arm to strike the officers again.*

Mastanduno's battle with the police line was sufficiently vigorous that it temporarily knocked his hat off. Below is a screenshot from a video which captures the same scene from behind.



*Image 26 (Ex. 13): View from behind after Mastanduno, circled in red, lost his hat; he continued raising his hand to strike at police officers with the baton.*

During this entire altercation, the police line was deploying chemical irritants in efforts to thwart the vicious mob. *See generally* Ex. 6 (CCTV showing many deployments of orange pepper spray/gel by law enforcement).

By approximately 4:45 p.m., Mastanduno had abandoned his position at the mouth of the tunnel after being sprayed with these chemical irritants. However, he remained nearby, apparently suffering from the effects of pepper spray.



*Image 27 (Ex. 14): Mastanduno, circled in red, stands just beside mouth of the LWT as rioters retrieve door from Senate Terrace Mezzanine Room 2 (ST-2M), for use against the officers defending the LWT.*

Mastanduno remained near the LWT until police regained control of the area, just after 5:00 p.m. on January 6, 2021. By that time, he had been unlawfully present on Capitol grounds for over three hours.



*Image 28 (Ex. 15): Mastanduno, circled in red, lying on inaugural staging area, and apparently suffering from effects of pepper spray.*

## III.     THE CHARGES AND PLEA AGREEMENT

On December 13, 2023, after failed plea negotiations, Mastanduno was indicted on nine charges. ECF 21, 29. On March 6, 2024, without the benefit of a plea agreement, Mastanduno pleaded guilty to all charges in the Indictment: Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count 1); Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b) (Counts 2 (flagpole) and 3 (baton)); Entering or Remaining in a Restricted Building or Grounds with a Dangerous or Deadly Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (Count 4); Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Dangerous or Deadly Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (Count 5); Engaging in Physical Violence in a Restricted Building or Grounds with a Dangerous or Deadly Weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A)

(Count 6); Disorderly Conduct in a Capitol Building or Ground, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count 7); Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count 8); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count 9).

## IV.    STATUTORY PENALTIES

Mastanduno now faces sentencing on each of the counts listed above. The maximum terms of incarceration for each count are detailed in the chart below.

| Count | Statute | Maximum Term of Imprisonment |
|---|---|---|
| 1 | 18 U.S.C. § 231(a)(3) | 5 years |
| 2 | 18 U.S.C. § 111(a)(1) and (b) | 20 years |
| 3 | 18 U.S.C. § 111(a)(1) and (b) | 20 years |
| 4 | 18 U.S.C. § 1752(a)(1) and (b)(1)(A) | 10 years |
| 5 | 18 U.S.C. § 1752(a)(2) and (b)(1)(A) | 10 years |
| 6 | 18 U.S.C. § 1752(a)(4) and (b)(1)(A) | 10 years |
| 7 | 40 U.S.C. § 5104(e)(2)(D) | 6 months |
| 8 | 40 U.S.C. § 5104(e)(2)(F) | 6 months |
| 9 | 40 U.S.C. § 5104(e)(2)(G) | 6 months |

For each of the felony counts, Counts 1-6, the Court may also impose a term of supervised release of not more than three years and a fine of up to $250,000, and the Court must impose a mandatory special assessment of $100 per felony count.

For the three Class B misdemeanor counts, Counts 7-9, Mastanduno faces up to six months of imprisonment or up to five years of probation, a fine of up to $5,000, and a mandatory special assessment of $10 for each count.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The government largely agrees with the Guidelines calculations in the Presentence Investigation Report ("PSR"), except the government objects to the grouping analysis contained in paragraphs 42 through 69 of the PSR and the resulting Guidelines calculations.

Instead, the government submits that the following Guidelines and grouping analysis should apply:

### Guidelines Analysis

**1. Count One: 18 U.S.C. § 231(a)(3) – Interfering with Police Officers During a Civil Disorder.**

Since there is no applicable Chapter Two Guideline for this offense in the Statutory Appendix, the Guidelines direct that "the most analogous guideline" applies. *See* U.S.S.G. § 2X5.1. Here, that is U.S.S.G. § 2A2.4, "Obstructing or Impeding Officers."

| Base Offense Level: | 10 | U.S.S.G. § 2A2.4 |
|---|---|---|
| Specific Offense Characteristic: physical contact | +3 | U.S.S.G. § 2A2.4(b)(1): The obstruction of officers "involved physical contact" and a dangerous weapon. The enhancement applies even if the physical contact is not direct. *See United States v. Taliaferro*, 211 F.3d 412, 415-16 (7th Cir. 2000).<br><br>Here, the offense involved physical contact with MPD Officers in the Lower West Tunnel. |
| Cross Reference | | U.S.S.G. § 2A2.4(c) directs that the cross-reference in § 2A2.2 applies "if the conduct constituted aggravated assault." |

24

| | | |
|---|---|---|
| | | "Aggravated assault," under comment 1 to § 2A2.2 "means a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury . . . or (D) an intent to commit another felony."<br><br>Here, consistent with the D.C. Circuit's opinion in *United States v. Sargent*, No. 23-3005, 2024 WL 2873106 (D.C. Cir. June 7, 2024), Mastanduno's assaults were felonious assaults because they involved physical contact and the intent to commit another felony. These felonious assaults were aggravated assaults because the flagpole and baton Mastanduno threw and used were both dangerous weapons. *See, e.g.*, *United States v. Ponder*, Sentc'g Tr. 7/26/2022 at 6.[7]<br><br>In addition, Mastanduno's assaultive conduct was not an end in itself, but was committed with the intent to disrupt the police during a civil disorder. |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2 |
| Specific Offense Characteristic: Dangerous Weapon | +4 | U.S.S.G. § 2A2.2(b)(2)<br><br>Mastanduno threw a flagpole at and used a baton to strike or attempt to strike officers guarding the Lower West Tunnel. These objects were used and intended to be used as deadly or dangerous weapons because (a) a flagpole, when launched into a group of people, is capable of |

---

[7] This Court held as follows in *Ponder*:

> The guideline for 18 U.S.C. § 111(a)(1) offenses is U.S. sentencing guideline §2A2.2. That section provides that an offense involving aggravated assault has a base offense level of 14. **Because a dangerous weapon was used, and that is on at least two occasions the defendant swung a pole at law enforcement, which in one incident resulted in contact, the offense level is increased by four.** The defendant was convicted under 18 U.S.C. § 111(b); therefore, the offense level is increased by two. And pursuant to U.S. sentencing guideline § 2A2.2, comment note 4, because U.S. sentencing guideline §3A1.2(a)(1) and (2) apply, and the applicable Chapter Two guideline is from Chapter Two, Part A, six levels are added.

(Emphasis added).

| | | |
|---|---|---|
| | | causing serious bodily injury, and (b) a baton is inherently dangerous and is capable of causing serious bodily injury. |
| Official Victim | +6 | U.S.S.G. § 3A1.2(a)-(b): "If (1) the victim was (A) a government officer or employee; . . . and (2) the offense of conviction was motivated by such status, increase by 3 levels.[8] <br><br> "If subsection (a)(1) and (2) apply, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person), increase by **6** levels." <br><br> Mastanduno attacked these uniformed MPD officers specifically to interfere with the election's certification inside the Capitol building, which the officers were trying to protect. <br><br> Because "Obstructing or Impeding Officers" is an "Offense[] Against the Person," it requires a 6 level increase. |
| **Total** | **24** | |

---

[8] Courts in this district have applied this enhancement in similar circumstances. *See, e.g., United States v. Schwartz*, 21-cr-178-1 (APM), Sentc'g Tr. 12-14 ("Given the circumstances of that day, for any officer to have been blinded even momentarily created an additional substantial risk of injury, given that there were multiple – not multiple – there were hundreds and thousands of other people intending to and doing harm to police officers that day. And so the use of the OC spray in a way that incapacitated officers and made them more vulnerable to injury, and serious bodily injury at that, given the amount and the number of people out there who were using makeshift weapons really did create a circumstance that I do think fits the definition under 2A1.2(c)(1)."); *see also, e.g., United States v. Worrell*, 21-cr-292 (RDB) (same); *United States v. Bingert*, 21-cr-91 (RCL) (same).

2.  **Count Two: Assaulting, Resisting, or Impeding Certain Officers, Inflicting Bodily Injury and Aiding and Abetting, 18 U.S.C. §§ 111(a)(1) and (b) and 2 (Assault with Flagpole).[9]**

| Base offense level | 10 | U.S.S.G. § 2A2.4. |
|---|---|---|
| Specific Offense Characteristics | +3 | U.S.S.G. § 2A2.4(b)(1)(A): "If (A) the offense involved physical contact; or (B) a dangerous weapon (including a firearm) was possessed and its use was threatened, increase by **3** levels."<br><br>Mastanduno made physical contact with, at a minimum, |

---

[9] Courts in this district have routinely held that throwing flagpoles javelin-style at officers is sufficient for a dangerous weapon finding. For example, Judge Bates stated in rendering his verdict in *United States v. Padilla*, 21-cr-214 (JDB):

> Video footage shows that, while Mr. Padilla was outside the entrance of the tunnel, he carried a plastic flagpole, aimed it toward the mouth of the tunnel, and launched it like a javelin into the tunnel where the line of police officers were standing trying to keep rioters out. Government Exhibit 229 shows that.
>
> . . .
>
> I find that, in doing such act, Mr. Padilla intentionally used a deadly or dangerous weapon. Relevant here, an object is a deadly or dangerous weapon if the object is capable of causing serious bodily injury or death to another person, and the defendant carried it with the intent that it be used in a manner capable of causing serious bodily injury or death. A flagpole is certainly capable of causing serious bodily injury. Given its shape and size, it could cause serious damage if it hits someone in the head, particularly if it struck someone in the eye. And as discussed earlier, I find that Mr. Padilla used the flagpole with the intent to strike an officer and impede or interfere with his duties by launching it at him, and that action was capable of causing serious bodily injury to the officer. Mr. Padilla admitted in his testimony that the way in which he used the flagpole could have been dangerous if the officers were not wearing helmets. But Mr. Padilla could not have possibly known with certainty that all the officers in that police line were wearing helmets. In fact, video footage shows that at least one officer lost his helmet. In any event, the flagpole could still cause injury even to an officer wearing a helmet due to the fact that there was a gap between the end of the officer's face shield and the body armor that would expose an individual's neck.

Trial Tr. 532-536.

| | | |
|---|---|---|
| | | Officer T.C. when he launched the flagpole into the group of officers guarding the Lower West Tunnel. In addition, he also used a dangerous or deadly weapon (the flagpole) in carrying out this physical contact. |
| Cross-Reference | | U.S.S.G. §2A2.4(c) – if the conduct constituted aggravated assault, apply § 2A2.2<br><br>Mastanduno's conduct was aggravated assault because the assault was committed with the intent to commit. another felony, namely Interfering with a Law Enforcement Officer During a Civil Disorder, charged in Count One. |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) |
| Specific Offense Characteristic: Dangerous Weapon | +4 | U.S.S.G. § 2A2.2(b)(2)<br><br>Mastanduno launched a flagpole javelin-style into a group of officers guarding the Lower West Tunnel, making physical contact with, at a minimum, Officer T.C. The flagpole was used and intended to be used as deadly or dangerous weapons because, when launched into a group of people, it is capable of causing serious bodily injury. This is especially so given at least one officer in the immediate vicinity did not appear to be wearing his police helmet, Officer T.J. |
| Specific offense characteristic | +2 | U.S.S.G. § 2A2.2(b)(7): If the defendant was convicted under 18 U.S.C. § 111(b), add **2** levels. |
| Adjustment | +6 | U.S.S.G. § 3A1.2(a)-(b): "If (1) the victim was (A) a government officer or employee; . . . and (2) the offense of conviction was motivated by such status, increase by 3 levels.<br><br>"If subsection (a)(1) and (2) apply, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person), increase by **6** levels."<br><br>Mastanduno attacked these uniformed MPD officers specifically to interfere with the election's certification inside the Capitol building, which the officers were |

28

| | | trying to protect. |
|---|---|---|
| | | Because "Obstructing or Impeding Officers" is an "Offense[] Against the Person," it requires a 6 level increase. |
| **Total** | **26** | |

### 3. Count Three: Assaulting, Resisting, or Impeding Certain Officers, Inflicting Bodily Injury and Aiding and Abetting, 18 U.S.C. §§ 111(a)(1) and (b) and 2 (Assault with Baton).

| | | |
|---|---|---|
| Base offense level | 10 | U.S.S.G. § 2A2.4. |
| Specific Offense Characteristics | +3 | U.S.S.G. § 2A2.4(b)(1)(A): "If (A) the offense involved physical contact; or (B) a dangerous weapon (including a firearm) was possessed and its use was threatened, increase by **3** levels." <br><br> Mastanduno made physical contact with at least one officer when he repeatedly used a telescoping baton to strike at front line of officers guarding the Lower West Tunnel. In addition, he also used a dangerous or deadly weapon (the baton) in carrying out this physical contact. |
| Cross-Reference | | U.S.S.G.  §2A2.4(c) – if the conduct constituted aggravated assault, apply § 2A2.2 <br><br> Mastanduno's conduct was aggravated assault because the assault was committed with the intent to commit. another felony, namely Interfering with a Law Enforcement Officer During a Civil Disorder, charged in Count One. |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) |
| Specific Offense Characteristic: Dangerous Weapon | +4 | U.S.S.G. § 2A2.2(b)(2) <br><br> Mastanduno used a telescoping baton to strike or attempt to strike officers guarding the Lowest West Tunnel. A baton is an inherently dangerous weapon, and it is also capable of causing serious bodily injury when used to strike at officers. |

| | | |
|---|---|---|
| Specific offense characteristic | +2 | U.S.S.G. § 2A2.2(b)(7): If the defendant was convicted under 18 U.S.C. § 111(b), add **2** levels. |
| Adjustment | +6 | U.S.S.G. § 3A1.2(a)-(b): "If (1) the victim was (A) a government officer or employee; . . . and (2) the offense of conviction was motivated by such status, increase by 3 levels. <br><br> "If subsection (a)(1) and (2) apply, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person), increase by **6** levels." <br><br> Mastanduno attacked these uniformed MPD officers specifically to interfere with the election's certification inside the Capitol building, which the officers were trying to protect. <br><br> Because "Obstructing or Impeding Officers" is an "Offense[] Against the Person," it requires a 6 level increase. |
| **Total** | **26** | |

### 4. Count Four: Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(1) and (b)(1)(A).

The Statutory Appendix lists two potentially applicable guidelines provisions for a Section 1752 offense: U.S.S.G. § 2A2.4 (Obstructing or Impeding Officers) and U.S.S.G. § 2B2.3 (Trespass). The Introduction to the Appendix states that, if "more than one guideline is referenced for a particular statute, use the guideline most appropriate for offense conduct." Here, U.S.S.G. § 2B2.3, which applies to trespass offenses, is the most appropriate guideline for 18 U.S.C. § 1752(a)(1), which is essentially a trespass offense.

| Base Offense Level: | 4 | U.S.S.G. § 2B2.3(a) |
|---|---|---|
| Special offense characteristic | +2 | U.S.S.G. § 2B2.3(b)(1)(A)(vii): If the trespass occurred "at any restricted building or grounds," add **2** levels.<br><br>On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |
| Special offense characteristic | +2 | U.S.S.G. § 2B2.3(b)(2): If the defendant possessed a dangerous weapon, add **2** levels. |
| Cross-Reference | | U.S.S.G. § 2B2.3(c)(1): If the offense was committed with the intent to commit a felony offense, apply § 2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above.<br><br>Mastanduno remained in the restricted area of the Capitol or its Grounds with the intent of interfering with law enforcement during a civil disorder. The substantive offense is thus Count One (18 U.S.C. § 231(a)(3)), and the base offense level for that offense should be applied. |
| Base Offense Level (adjusted) | 18 (from Count One) | U.S.S.G. § 2X1.1(a) provides that the base offense level is "[t]he base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty."<br><br>Mastanduno entered the restricted area of the Capitol for the purpose of obstructing, impeding, or interfering with police during a civil disorder. The substantive offense is thus Count One, and the base offense level and Chapter 2 adjustments for that offense total 18. |
| Official Victim | +6 | U.S.S.G. § 3A1.2(c): "If in a manner creating a substantial risk of serious bodily injury, the defendant or a person for whose conduct the defendant is otherwise accountable—(1) knowing or having reasonable cause to believe that a person was |

| | | |
|---|---|---|
| | | a law enforcement officer, assaulted such officer during the course of the offense or immediate flight therefrom… increase by **6** levels. |
| | | Mastanduno attacked MPD officers guarding the Lower West Tunnel by launching a flagpole javelin-style into a group of officers, including Officer T.C. He also attacked the officers by striking or attempting to strike them with a baton. At the time, these officers were in uniform, were surrounded by other officers in uniform, and were performing their official duties guarding the Capitol. |
| | | Mastanduno thus knew or had reasonable cause to believe that these officers were law enforcement officers. Using the flagpole in this manner, in particular, created a substantial risk of serious bodily injury. |
| | | As such, a 6-level increase is required. |
| **Total** | **24** | |

5. **Count Five: Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(2) and (b)(1)(A).**

The Statutory Appendix lists two potentially applicable guidelines provisions for a Section 1752 offense: U.S.S.G. § 2A2.4 (Obstructing or Impeding Officers) and U.S.S.G. § 2B2.3 (Trespass). The Introduction to the Appendix states that, if "more than one guideline is referenced for a particular statute, use the guideline most appropriate for offense conduct." Here, U.S.S.G. § 2A2.4, which applies to impeding officers, is the most appropriate guideline for 18 U.S.C. § 1752(a)(2), which prohibits "disorderly and disruptive conduct."

| | | |
|---|---|---|
| Base Offense Level: | 10 | U.S.S.G. § 2A2.4(a) |
| Special offense characteristic | +3 | U.S.S.G. § 2A2.4(b)(1)(A): "If (A) the offense involved physical contact; or (B) a dangerous |

|  |  | weapon (including a firearm) was possessed and its use was threatened, increase by **3** levels." |
| --- | --- | --- |
|  |  | *See* discussion regarding physical contact and use of a weapon for Counts Two and Three, above. |
| Cross reference |  | U.S.S.G. § 2A2.4(c) – if the conduct constituted aggravated assault, apply § 2A2.2 <br><br> *See* discussion regarding application of aggravated assault guideline for Counts Two and Three, above. |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) |
| Specific offense characteristic: Dangerous Weapon | +4 | U.S.S.G. § 2A2.2(b)(2)(B): "If … (B) a dangerous weapon (including a firearm) was otherwise used, increase by **4** levels." <br> *See* discussion of Mastanduno's use of flagpole and baton to assault MPD officers with respect to Counts Two and Three, above. |
| Official Victim | +6 | U.S.S.G. § 3A1.2(c): "If in a manner creating a substantial risk of serious bodily injury, the defendant or a person for whose conduct the defendant is otherwise accountable—(1) knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense or immediate flight therefrom… increase by **6** levels. <br><br> *See* discussion in Count Four above. |
| **Total** | **24** |  |

6. **Count Six: Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(4) and (b)(1)(A).**

| Base offense level | 10 | U.S.S.G. §2A2.4. |
| --- | --- | --- |
| Specific Offense Characteristics | +3 | U.S.S.G. §2A2.4(b)(1)(A): "If (A) the offense involved physical contact; or (B) a dangerous weapon (including a firearm) was possessed and its use was threatened, increase by **3** levels." <br><br> *See* discussion with respect to Counts One, Two, and |

| | | |
|---|---|---|
| | | Three, above. |
| Cross-Reference | | U.S.S.G. § 2A2.4(c) – if the conduct constituted aggravated assault, apply § 2A2.2<br><br>*See* discussion with respect to Counts Two and Three, above. |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) |
| Specific offense characteristic: Dangerous Weapon | +4 | U.S.S.G. § 2A2.2(b)(2)(B): "If … (B) a dangerous weapon (including a firearm) was otherwise used, increase by **4** levels."<br><br>*See* discussion of Mastanduno's use of the flagpole and baton to assault Officers T.C. (Count Two) and J.C., M.D., T.J., L.M., S.S., J.S., and A.W. (Count Three), above. |
| Adjustment | +6 | U.S.S.G. § 3A1.2(a)-(b): "If (1) the victim was (A) a government officer or employee; . . . and (2) the offense of conviction was motivated by such status, increase by 3 levels.<br><br>"If subsection (a)(1) and (2) apply, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person), increase by **6** levels."<br><br>*See* discussion with respect to Counts Two and Three, above. |
| **Total** | **24** | |

**7. Count Seven: Disorderly Conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D);**

Because this offense is a Class B misdemeanor, the Guidelines do not apply. *See* 18 U.S.C. § 3559; U.S.S.G. § 1B1.9.

34

8. **Count Eight: Act of Physical Violence in the Capitol Grounds or Buildings, 40 U.S.C. § 5104(e)(2)(F).**

Because this offense is a Class B misdemeanor, the Guidelines do not apply. *See* 18 U.S.C. § 3559; U.S.S.G. § 1B1.9.

9. **Count Nine: Parading, Demonstrating, or Picketing in a Capitol Building, 40 U.S.C. § 5104(e)(2)(G)**

Because this offense is a Class B misdemeanor, the Guidelines do not apply. *See* 18 U.S.C. § 3559; U.S.S.G. § 1B1.9.

### <u>Grouping Analysis</u>

Under U.S.S.G. § 3D1.2(a) and (c), "closely related counts" group. Under U.S.S.G. § 3D1.3(a), we then determine the offense level for each group of closely related counts, using the highest offense level of the counts in each group.

The government's grouping analysis is as follows:

a) <u>**Group One:**</u> The government agrees with Probation that this group consists of Count One (Civil Disorder) and Count Two (Assault on Officer T.C. with Flagpole) and Count Six (Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon). For the reasons explained below, Counts 4 and 5 should be in a separate group because those crimes involves different victims.

The offense level for this group is 26.

b) <u>**Group Two**</u>: As the PSR notes, this group consists of Count Three (assault with baton on group of officers excluding Officer T.C.). Thus, the offense level for this group is 26.

c) <u>**Group Three**</u>: This group consists of Count Four (entering/remaining on restricted grounds) and Count Five (disorderly/disruptive conduct on restricted grounds). The victim of these offenses is Congress. U.S.S.G. § 3D1.2(a).

The offense conduct for this group is all of the defendant's conduct while on restricted grounds on January 6, including unlawfully entering the Capitol building through the Senate Wing Door around 2:17 p.m.; remaining at the front of a line of

35

rioters who overwhelmed police officers in the Crypt; illegally remaining on Capitol grounds until around 5:00 p.m., where the defendant used and carried dangerous weapons.

The government objects to the PSR's inclusion of these counts in Group One. Group One addresses a physical threat of injury to law enforcement officers. By contrast, Counts Four and Five address the harm caused to Congress by disruptive conduct on restricted grounds. Counts Four and Five therefore involve a different and unique harm than the one posed by Counts One, Two and Six. And while Counts Four and Five should each be enhanced by a specific offense characteristic ("SOC") involving the use of a dangerous weapon, the underlying conduct constituting these crimes against Congress does not embody conduct which is treated as an SOC to either Counts One, Two, or Six.[10]

The highest offense level for this group is 24.

Counts Seven, Eight, and Nine are not grouped because the Guidelines do not apply to them.

---

[10] For example, in *United States v. Mack*, 2023 WL 3163247 (10th Cir. May 1, 2023), the Tenth Circuit found that a defendant's felon-in-possession count did not group with his fraud count, even though the felon-in-possession count was enhanced by an SOC for possessing the firearm "in connection with another felony offense" and the district court could have (but did not) applied a similarly worded SOC to his fraud count for possession of a weapon. The Tenth Circuit agreed that "the plain language of § 3D1.2(c) facially supports Mack's position." *Id.* at *3. But the Tenth Circuit found that it was necessary to look beyond the text of § 3D1.2(c) to the commentary which makes clear that §3D1.2(c) only applies if the offenses are closely related. The court went on to find that, despite the fact that the felon-in-possession count had been enhanced with an SOC based on the fraud, it was not clear that his fraud and felon-in-possession offenses were "closely related." *Id.* Focusing on the nature of the harm, the court observed that the victim of Mack's fraud were individuals who fell prey to his scam, various banks, and the United States. By contrast, the felon-in-possession count implicated only the societal interest in keeping firearms away from those unqualified to possess them. *Id.* In the absence of evidence that Mack used a firearm on one of his fraud victims, the court found that grouping was not necessary. *Id.* at *4.

Similarly, the Eleventh Circuit joined with the majority view, finding that a district court did not err in refusing to group a defendant's tax offense counts with his wire and mail fraud counts under either § 3D1.2(c) or (d), and noting that (as of 2016) the majority of circuits to address the issue have concluded that fraud counts and tax offense counts involving the proceeds of the fraud should not be grouped together. *United States v. Doxie*, 813 F.3d 1340, 1345 (11th Cir. 2016).

**Unit Analysis**

Pursuant to U.S.S.G. § 3D1.4, one unit is counted for Group One. An additional unit is counted for Group Two. And an additional unit is counted for Group Three.

**Total Offense Level**

A total of three units results in an increase of three points to the group with the highest offense level (26), for a total offense level of 29. A three-point reduction for acceptance of responsibility results in a final total offense level of 26, one point higher than calculated in the PSR.

The U.S. Probation Office calculated Mastanduno's criminal history as category I, which is not disputed. PSR ¶ 72. Accordingly, the government's calculation of Mastanduno's total adjusted offense level, after acceptance of responsibility for pleading guilty to the Indictment, is 26. Mastanduno's Guidelines imprisonment range is, therefore, 63 to 78 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

Sentencing is guided by 18 U.S.C. § 3553(a). The Section 3553(a) factors weigh in favor of a term of incarceration at the mid-level of the applicable Guidelines range.

### A.    Nature and Circumstances of the Offense

Mastanduno was part of a massive riot that almost succeeded in preventing the Certification Vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). This Court and others concurred. *See United States v. Foy*, 21-cr-108 (TSC) (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish.

This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United States v. Mazzocco*, 21-cr-54 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers."); *see also United States v. Cua*, 21-cr-107 (RM), 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (describing the riot as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself"); *United States v. Chrestman*, 21-mj-218 (BAH), 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.").

Mastanduno went to the most violent area, the LWT, and joined in the hours-long, vicious attack on police officers. Mastanduno's assaults directly contributed to Officer T.C.'s mental anguish from that day. Although his other assaults did not result in known injuries to the police officers guarding the tunnel entrance, Mastanduno was an active participant in a violent mob that left numerous officers seriously injured. Mastanduno was undeterred as officers nearby were violently dragged out of the tunnel and a rioter lay motionless beside him, dying. Instead, during those exact moments, he launched a flagpole javelin-style into the group of officers, and, moments later, repeatedly struck those officers with a baton while pushing them with a stolen police riot shield. The nature and circumstances of Mastanduno's crimes are of the utmost seriousness and fully support the government's recommended sentence of 72 months' incarceration.

**B.  The History and Characteristics of the Defendant**

Although he has no criminal convictions, Mastanduno's history and characteristics weigh in favor of a Guidelines sentence in this case. Mastanduno knew the importance of following commands of law enforcement as well as the danger faced by officers confronted by an unruly group of individuals.

Mastanduno served four years in the United States Marine Corps, from 1983 until his honorable discharge in 1987. PSR ¶ 110. While the defendant's prior military service is commendable, it does not justify or mitigate the crimes that he committed on January 6, 2021 while clad in military-style fatigues and a USMC hat. The Court should not treat Mastanduno more leniently because he once took an oath to defend the Constitution years before violently attempting to subvert it. On January 6, Mastanduno actively fought against the very United States he previously swore to protect, and he fought to undermine the Constitution that he previously swore to defend.

Moreover, after leaving the Marine Corps in 1987, Mastanduno worked as a security guard for Wells Fargo. PSR ¶ 114; ECF 31 at 4. Then, for fifteen years beginning in 1988, Mastanduno volunteered with the Copiague, New York, Fire Department. ECF 31 at 4. As a military veteran and former security guard and volunteer firefighter, Mastanduno knew the sacrifice made by first responders.

**C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a significant sentence of incarceration to deter Mastanduno and those that would engage in similar conduct.

Mastanduno's criminal conduct on January 6 was the epitome of disrespect for the law. This Court recognized the seriousness of similar conduct where a defendant assaulted officers using pole-like objects:

> The January 6 attack on the U.S. Capitol was unprecedented, violent, and posed an existential threat to our democracy. It continues to reverberate today. It has exposed and maybe caused serious cracks in our democratic system. It terrified a nation who watched that day and continues to reverberate as we've seen more and more evidence from the events of that day.
>
> I have watched many, many, many hours probably of this case of videotape and listened to audio and seen photographs from that day, and I continue to be shocked by what I saw. I watched last night again the video clips involving Mr. Ponder, and they are horrifying. And I'm watching them on a screen, and I'm holding my breath and I am terrified, and I cannot imagine what Sergeant [ ] and his fellow officers were feeling as they were attacked repeatedly by a mob that was hellbent to kill them to get to where they wanted to go. And they were outnumbered. And they were just trying to do their job.
>
> I cannot imagine what that was like.
>
> . . .
>
> [And] Mr. Ponder was a violent participant in that attack.
>
> . . .
>
> There are numerous moments when Mr. Ponder could have stopped what he was doing and said okay, you know what, this is crazy. I lost my head. He could have stopped after the pole broke, after he cracked Officer [ ]'s shield. He could have stopped after police told him to leave the premises, when he realized he could be prosecuted. But there was no transport vehicle. Each time, he comes back. He was intent on attacking and injuring police officers. This was not a protest.
>
> And as long as he had the safety of numbers around him, he kept doing it. This was not bravery. This was not patriotism. The people who were brave, the people who

were patriots that night were the officers and the employees inside the Capitol who were risking their lives.

*United States v. Ponder,* Sentc'g Tr. 7/26/2022 at 25-30.

### D.      The Need for the Sentence to Afford Adequate Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[11] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. As the Court explained during the sentencing of January 6 defendant Robert Scott Palmer,

> I have to consider deterrence, and I have to make it clear that the actions you engaged in cannot happen again. Every day we're hearing about reports of antidemocratic factions of people plotting violence, the potential threat of violence, in 2024. It has to be made clear that trying to violently overthrow the government, trying to stop the peaceful transition of power, and assaulting law enforcement officers in that effort is going to be met with absolutely certain punishment: Not staying at home, not watching Netflix, not doing what you were doing before you got arrested in this case. That there are going to be consequences. I am not making an example of you. I am sentencing you for the conduct that you did. But one of the things I need to make clear is this is the consequence of those actions.

*United States v. Palmer,* Sentc'g Tr. 12/17/2021 at 45.

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a lengthy term of incarceration. Mastanduno's actions on January 6 were deliberate and dangerous. *See* Sections II(B) and IV(A) *supra.* It is unclear whether Mastanduno has expressed remorse for his criminal conduct at any time since January 6, 2021.

---

[11] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

### E.        The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.        Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[12]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[13]

---

[12] The Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, 22-cr-31 (FYP), Sentc'g Tr. 8/26/2022 at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[13] A routinely updated table providing additional information about the sentences imposed on

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

The Court may wish to compare Mastanduno's conduct to that of Mark Ponder. *See United States v. Ponder*, 21-cr-259 (TSC). Like Mastanduno, Ponder assaulted police officers on the Capitol grounds by striking them with two different weapons (there, two poles). From there, he went to the Upper West Terrace where he confronted police trying to clear the area, again striking an officer with a pole. After being handcuffed and released, Ponder then made his way to the LWT tunnel where he joined the fight against the police. Unlike Mastanduno, Ponder did not engage in pre-planning and did not have a safe and comfortable upbringing. Ponder pleaded guilty to one count of violating of 18 U.S.C. § 111(a) and (b). This Court sentenced Ponder to 63 months' imprisonment, at the top of his Guidelines range. Here, Mastanduno chose to plead open to multiple felony counts, including two counts of assaulting officers with a deadly or dangerous weapon. Thus, his Guidelines range is necessarily higher than Ponder's, and a longer sentence is warranted.

The facts of this case also are similar to those before the Court in the case of Robert Scott Palmer. *See United States v. Palmer*, 21-cr-328 (TSC). Palmer, like Mastanduno, assaulted multiple law enforcement officers in the Lower West Terrace. While in the area, Palmer threw

other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

wooden items at officers and sprayed a fire extinguisher at them. Like Mastanduno, Palmer had no criminal history. Palmer pleaded guilty to one count of violating of 18 U.S.C. § 111(a) and (b). This Court sentenced Palmer to 63 months' imprisonment, at the low end of his Guidelines range. Again, here, Mastanduno chose to plead open to multiple felony counts, which made his Guidelines range higher than Palmer's. Thus, a longer sentence is warranted.

Finally, the Court may wish to consider its sentencing of Scott Miller. *See United States v. Miller*, 22-cr-412 (TSC). Like Mastanduno, Miller arrived at the Capitol on January 6 prepared for violence. He wore neon orange ski goggles and gloves with plastic knuckles. Also like Mastanduno, Miller made his way through the dense crowd to the LWT where dozens of police officers defended an entrance to the Capitol Building. Over the course of approximately 20 minutes, as part of the rioters' violent efforts to get into the Building, Miller conducted multiple attacks on the police at the LWT tunnel, including throwing a metal pipe or pole, a bottle, a stick, and a large speaker at the group of officers. Miller also took a stolen police riot shield and handed it to another rioter. Unlike Mastanduno, however, Miller was affiliated with the Maryland/D.C. Chapter of the Proud Boys. Miller pleaded guilty to one count of violating of 18 U.S.C. § 111(a) and (b). This Court sentenced Palmer to 66 months' imprisonment, at the middle of his Guidelines range. Here, Mastandano was convicted of multiple felony counts, thus subjecting him to a longer Guidelines range of imprisonment.

Accordingly, a sentence of 72 months, at the mid-range of Mastanduno's Guidelines range, would not create an unwarranted sentencing disparity.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted).

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[14]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v.*

---

[14] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

*Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Mastanduno to pay $2,000 in restitution for his convictions on Counts One through Six. This amount fairly reflects Mastanduno's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

The defendant's convictions for violations of Sections 231(a)(3) and 111(b), among other felony crimes, each subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See*

U.S.S.G. § 5E1.2(d). The Sentencing Guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, according to the PSR, the defendant has the assets to pay a fine. *See* PSR ¶ 125 ("Although the defendant has in excess of $200,000 in assets, the majority is in his house's equity and Morgan Stanley certificate of deposits (CD)."). Thus, pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e).

## IX. CONCLUSION

For the reasons set forth above, the government requests that this Court sentence Anthony Mastanduno to 72 months of incarceration, at the mid-range of the applicable Sentencing Guidelines range; three years of supervised release; $2,000 in restitution; and a $630 mandatory special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:   */s/ Jordan A. Konig*
JORDAN A. KONIG
Supervisory Trial Attorney
Tax Division, U.S. Department of Justice

49

Detailed to the U.S. Attorney's Office
P.O. Box 55, Washington, D.C. 20044
Jordan.A.Konig@usdoj.gov
Tel.: 202-305-7917

SAMANTHA R. MILLER
Assistant United States Attorney
New York Bar No. 5342175
United States Attorney's Office
For the District of Columbia
601 D Street, NW 20530
Samantha.Miller@usdoj.gov