UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>vs.<br><br>ANTHONY MASTANDUNO,<br><br>    Defendant. | DOCKET NO. 1:23-cr-434 (TSC)<br><br>**DEFENDANT'S SENTENCING MEMORANDUM** |

  Anthony Mastanduno, through counsel, Assistant Federal Public Defender Rhett H. Johnson (WDNC), submits this Sentencing Memorandum.  On March 6, 2024, Mastanduno pled guilty to all counts in the nine-count Indictment, all of which relate to his conduct at the United States Capitol on January 6, 2021.

  There are remaining guideline disputes to be resolved at sentencing.  Both Mastanduno and the Government submitted lengthy objections to the Presentence Report ("PSR").  Mastanduno stands by his objections and incorporates them by reference.[1]  Regardless of how this Court resolves these disputes and calculates the advisory guideline range, Mastanduno maintains that a sentence not to exceed 14 months, followed by a term of supervised release, is appropriate in this matter.

  In support of this requested sentence, Mastanduno asks this Court to consider

---

[1] At this time of filing, the parties have not received a Final Presentence Report. Accordingly, references to the PSR herein relate to the Draft Presentence Report filed on May 23, 2024.  *See* Dkt. No. 40.

the following factors in the § 3553(a) analysis:  his background and characteristics, marked by (1) a clean criminal record at 61 years old; (2) civic and military service, which includes over 15 years of service as a volunteer firefighter in New York, where he volunteered to respond to Ground Zero shortly after 9/11 to assist in the search and recovery efforts; (3) his age along with his medical and mental health issues; (4) his near lifetime's worth of steady employment; (5) his devotion to his family and wife of over thirty years, (6) his post-offense conduct (and/or lack thereof), and (7) his markedly low risk of recidivism.

## I.   PRESENTENCE REPORT OBJECTIONS

Mastanduno's objections to the PSR are adequately set forth in his previously filed objections.  *See* Dkt. No. 41.  Included in that filing are screenshots and video exhibits that Mastanduno intends to rely on at sentencing in support of his position.[2] In sum, Mastanduno maintains that his guideline range should be calculated under U.S.S.G. § 2A2.4 rather than U.S.S.G. § 2A2.2 and treated as one group for sentencing purposes.  Under § 2A2.4, at Criminal History Category I, his guideline range should be 8 to 14 months with Zone B sentencing options.

### a.   GROUPING

The PSR separated Mastanduno's convictions into two separate groups, raising the offense level by one under U.S.S.G. § 3D1.4.  *See* Draft PSR, at ¶ 62.  It did so based on an assertion that each assault conviction involved a different victim.

---

[2] It is undersigned counsel's understanding that these five video exhibits have been received by the Court.

Mastanduno explained in his objections that the record evidence, including the parties' joint factual submission, do not establish that the assaults involved different victims.  Accordingly, the convictions are properly classified as a single group under U.S.S.G. § 3D1.2(b). *See* Dkt. No. 41, at 4-5.

After Mastanduno filed his objections, the government filed its own objection to the grouping calculation.  The government did not respond to Mastanduno's argument.  It argued instead that the convictions should be divided into three separate groups, not two as the PSR asserted (or one as Mastanduno contends).  In support, the government argues that Counts Four and Five (violations of 18 U.S.C. § 1752) form a separate group because the "victim of these offenses is Congress." *See* Dkt. No. 42, at 1.

The government's analysis mis-applies the grouping rules in U.S.S.G. § 3D1.2. Under the first two subsections of that provision, multiple counts can be grouped together only if they involve "the same victim." *See* U.S.S.G. § 3D1.2(a)-(b).  But the third subsection allows for grouping even if offenses involve different victims, and the PSR correctly relied on that provision in concluding that Counts Four and Five are grouped together with Counts One and Two. *See* PSR, at ¶ 43 (applying U.S.S.G. § 3D1.2(c)). Under that provision, counts must be grouped if "one of the counts embodies conduct that is treated as a specific offense characteristic in . . . the guideline applicable to another of the counts." U.S.S.G. § 3D1.2(c).  As applied here, grouping is required because conduct embodied in Counts One and Two—the use of a dangerous weapon—is treated as a specific offense characteristic for Counts Four

3

and Five, a point that the government appears to concede.  *See* Dkt. No. 42, at 3-5. This point is dispositive under the plain text of § 3D1.2(c).

The government offers an unpublished Tenth Circuit decision, *United States v. Mack*, 2023 WL 3163247 (10th Cir. 2023), in support of its grouping argument.  In *Mack*, the district court treated a fraud offense and a felon-in-possession offense as separate groups, even though it applied an enhancement for using a firearm in connection with the fraud offense.  The Tenth Circuit affirmed that grouping decision on plain-error review, concluding that any error in failing to group the counts was not "clear or obvious" because the § 3D1.2 commentary requires that grouped offenses must be "closely related." *Id.* at *3 (citing U.S.S.G. § 3D1.2 comment., n.5).  That standard was not clearly or obviously met because "there is no evidence that Mack used a firearm on anyone who fell prey to his fraudulent scheme." *Id.* at *4.

Here, by contrast, the separate offenses are "closely related."  Indeed, all of the offenses occurred in one episode on January 6, and the government does not suggest otherwise. Its sole argument is that "the harm caused to Congress by disruptive conduct on restricted grounds" is "a different and unique harm."  *See* Dkt. No 42, at 3. But the commentary specifically provides that offenses can remain "closely related," and thus groupable under § 3D1.2(c), even where they "involve[ ] a different harm or societal interest." U.S.S.G. § 3D1.2 comment., n.5.[3]  Put simply, the

---

[3] The government's interpretation of the *Mack* decision seems to suggest that the commentary's "closely related" language creates a separate and additional requirement for grouping beyond that required by § 3D1.2(c)'s text. Such an interpretation would render the commentary inconsistent with the text, in which case this Court is obliged to follow the text. *See United States v. Winstead*, 890 F.3d 1082,

government's request for a third group cannot be squared with the applicable text or commentary.

Alternatively, if the Court disagrees with Mastanduno's single-group argument, it should conclude that the grouping rules overstate the seriousness of the offense. The purpose of the grouping rules is "to limit the significance of the formal charging decision and to prevent multiple punishment for substantially identical offense conduct" in multiple-count cases. U.S.S.G. Ch. 3, pt. D, intro. comment. That purpose will be thwarted if Mastanduno's offense level is increased by dividing his January 6 conduct into three separate groups. Indeed, the government offered Mastanduno a plea agreement to a single § 111 count, in which case he would not have faced any increase to his guidelines range under the grouping rules. However, because that plea offer required Mastanduno to stipulate to application of the aggravated assault guideline (U.S.S.G. § 2A2.2)—a stipulation that has the effect of tripling or quadrupling the applicable guidelines range—he entered a straight plea to all offenses so that this Court can address the guidelines issue itself. *See supra* Section 1.b. Regardless of how the Court resolves that very close legal issue, it should not impose additional punishment based on Mastanduno's desire that this Court be allowed to determine the appropriate guidelines range (rather than the prosecutor making that determination through a plea agreement). Accordingly, if the Court

---

1090 (D.C. Cir. 2018). The Court should not need to reach the text-versus-commentary issue in this case, given that the "closely related" standard is easily satisfied, as explained above. Nonetheless, we note the issue to preserve it for further argument.

decides that multiple groups are technically required under the guidelines, it should vary downward to eliminate the effect of that technical ruling.

### b.   BASE OFFENSE LEVEL

For the reasons set forth in his objections, Mastanduno maintains that his guideline range should be calculated under U.S.S.G. § 2A2.4 (obstructing or impeding officers) rather than U.S.S.G. § 2A2.2 (aggravated assault).

The government has indicated that it believes the decision in *United States v. Sargent*, --- F.4th ---, 2024 WL 2873106 (D.C. Cir. June 7, 2024), undermines Mastanduno's § 2A2.4 argument. In *Sargent*, the D.C. Circuit affirmed the district court's application of § 2A2.2, rather than § 2A2.4, when calculating the guidelines range for a § 111 offense committed on January 6.

The *Sargent* decision is not dispositive here because it does not address the case-specific arguments that Mastanduno has presented. In *Sargent*, the defendant did not dispute that he assaulted an officer with the intent to commit *another* felony, that is, a violation of the civil disorder statute. Although such an assault would require application of § 2A2.2 based on the guidelines commentary—which specifically includes any assault committed with "an intent to commit another felony"—the defendant argued that the commentary conflicted with the term "aggravated assault" that appears in the plain text of the guidelines. In the defendant's view, "the common understanding of aggravated assault requires more than [ ] minimal contact" and thus cannot be satisfied by a minimal-contact assault committed with the intent to commit another felony. *See* Brief of Defendant-

Appellant Troy Sargent, 2023 WL 3863244 (June 6, 2023), at *7.

The D.C. Circuit rejected this commentary-based argument. It found that the "text, structure, and context of the Guidelines" establish that "aggravated assault" under § 2A2.2 applies to "assaults with intent to commit another felony." *Sargent*, 2024 WL 2873106, at *5. Because the defendant had never disputed that his conduct included an assault with the intent to commit another felony, the Court's legal ruling about the meaning of "aggravated assault" resolved the case.

Here, by contrast, Mastanduno has never contested the validity of the guidelines commentary or how it defines "aggravated assault. Instead, he contends that the standard set by the commentary is not satisfied under the facts of his case. Specifically, he argues that his assault was not committed with the intent to commit *another* felony, an argument that has been accepted by other district court judges in January 6 cases with facts similar to those here. *See* Dkt. No. 41, at 9-12. The defendant in *Sargent* did not present a similar argument, and thus the *Sargent* decision does not foreclose Mastanduno's case-specific argument.

In any event, even if the Court decides to apply § 2A2.2, the *Sargent* decision supports Mastanduno's request for a sentence not to exceed 14 months. Although the district court in *Sargent* applied § 2A2.2, it varied down to impose a 14-month sentence, equal to the high end of the range of 8 to 14 months that would have applied under § 2A2.4. *Sargent*, 2024 WL 2873106, at *4.[4] A similar variance would be

---

[4] According to the government, Mr. Sargents's conduct included (1) scaling a media tower while recording himself; (2) striking a police officer with open hand; (3) swinging his hand again at the same officer, but missing and striking another rioter,

warranted here because application of the aggravated assault guideline would overstate the seriousness of Mastanduno's specific conduct, as discussed in more detail below.

## II.   18 U.S.C. § 3553(A) FACTORS

### a.   NATURE AND CIRCUMSTANCES OF THE OFFENSE

The most serious offenses Mastanduno is pleading guilty to are two counts of 18 U.S.C. 111(a)(1) and (b)) for Assaulting, Resisting, Impeding a Law Enforcement Officer with a Dangerous Weapon.  Count Two of the Indictment involves the use of a pole-like object that appears to be a hollow aluminum mop pole.  *See* Dkt. No. 1. Count Three involves the use of a collapsible baton.  With respect to Count Two, Mastanduno acknowledges that he lobbed what appears to have been a hollow aluminum broom or mop handle object over the crowd of protestors towards the area where the police officers were positioned in the mouth of the Capitol's West Terrace "tunnel."  From the BWC video, it appears the pole made contact with an officer's riot shield before falling to the ground.  *See* Dkt. No. 41, Defense Exhibit 5 (Officer Powell BWC Video).  With respect to Count Three, Mastanduno acknowledges that he swung a collapsible baton against the riot shields held by Capitol Police officers around 5-7 times before being subdued by pepper spray.  He was also carrying a police riot shield

---

(4) boasting later on social media that he "duffed a cop in the face. *See United States v. Troy Sargent*, Gov't. Sent. Memo at 9-14 (D.D.C. 2022).  Later, in Facebook messages, Sargent asked a friend, "Tell me somebody got video of me punching the cops in their visor," and bragged that "I got two hits in in on the same rookie cop and then he maced me."  Sargent further stated, "every time [the officer] came in his visor was all full of [mace] … I knew [he] couldn't see s*** so I just jumped out from behind somebody[,] punched him as hard as I could [right] in his [visor]. *Id.* at 15-16.

that he had picked up off the ground.

His conduct was serious to be sure, particularly in view of how heavily outnumbered the police officers were at the time. However, the video footage does not clearly show Mastanduno making physical contact with any officer with his baton, much less physically injuring anyone other than himself.

Aside from this brief flurry of activity at the tunnel area, the remainder of his conduct in the Capitol was unremarkable and even tame by comparison. From a review of the video footage from inside the Capitol, Mastanduno is amongst the least boisterous of the participants. He was not chanting, yelling, destroying property, arguing with police officers, yelling obscenities at them, or engaging in any other type of menacing conduct. At one point, while in the crypt area, he can be seen standing alongside some of the Capitol Police officers and appears to be compliant with their instructions. At another point, he can be seen rendering aid to another man who had been pepper sprayed.

> **b.** **History and Characteristics of Anthony Mastanduno, Jr.**

> **i.** **Early Childhood and Upbringing**

Anthony "Tony" Mastanduno is 61 years old. He was born in 1963, the youngest of five siblings, who were raised in Long Island, New York. His father served in the United States Marine Corps, fought in combat during World War II, and received a Purple Heart for his service. When Mastanduno was three years old, his father left the family home, leaving Mastanduno's mother, Beatrice Mastanduno, to raise five children on her own. His mother struggled to financially support the

family on her own.  She received help from her parents, but when they both passed away, she had to rely on government financial assistance.

At 12 years old, seeing his mother struggle to make ends meet, Mastanduno began working at the Tackapausha Museum and Nature Preserve.  He worked there for around four years until he was 16 years old and began working at a local Burger King restaurant.  After graduating high school in 1981, he worked as a machinist and painter.  He attended college for a short period before enlisting in the United States Marine Corps.

### ii.    Military Service and Civic Service

At the age of 20, Mastanduno enlisted in the Marines.  He was honorably discharged four years later at the rank of Corporal.  During his service, he was deployed overseas to Africa, and Central and South America.  During his service he was awarded the Rifle Sharpshooter Badge, Sea Service Deployment Ribbon, and Good Conduct Medal.  *See* PSR, ¶ 111.[5]

At 19 years old, prior to enlisting in the Marine Corps, Mastanduno volunteered with the Seaford Fire Department.  *See* PSR, ¶ 115.  Upon completing his service in the Marines, Mastanduno served as a volunteer firefighter with the Copiague Fire Department for 15 years between 1988 and 2003.  In this capacity, Mastanduno fulfilled an important role to his community all while being actively involved in the upbringing of his children, working full time at the power company,

---

[5] Many of the military records submitted were barely legible.  Counsel has since provided the probation officer with a more legible copy of Mastanudno's DD-214, which confirms the above-listed information.

and for many years operating a construction business on the side. Several letters of support address Mastanduno's service as a firefighter, but one in particular provides profound insight into what kind of person Mastanduno is. In his letter of support, James Skalkowski, a fellow former New York Firefighter, discusses how Mastanduno volunteered to leave his team stationed outside the city to join Skalkowki's unit, who were involved in the search and rescue efforts at Ground Zero.

> In the years I've known Mr. Mastanduno, I've observed a good man who put his family and Country as his highest priorities. Whether it was his time that he served our great Country in the United States Marine Corps or his community involvement in the volunteer fire service, he sacrificed many hours for the good of others. His willingness to help others has always been one of his most admirable traits.
>
> One such instance I would like to bring to your attention is in the days following the attacks of September 11, 2001, I was working at the site of the World Trade Center as career New York City Firefighter. While walking towards an area we were assigned to work in one of the days following September 11th, I came across Mr. Mastanduno who was there, on his own, wearing his gear from the volunteer fire department. His desire to do something to help was clearly evident and he asked if there was anything he could do. I asked him to join our crew and he worked side by side with us for countless hours searching the debris for any survivors.

James Skalkowski Letter of Support.[6]

### iii.    Employment History

After leaving the Marine Corps, Mastanduno moved to Copiague, New York and began working as an armed security guard for Wells Fargo. Shortly thereafter, in 1988, he began a new career with the local electric company, which would later become Public Service Enterprise Group – Long Island ("PSEGLI"). He worked in various positions at PSEGLI for 35 years before his retirement in 2023. Much of his

---

[6] Several letters of support have been submitted through counsel on Mastanduno's behalf and will be provided to the Court and government under separate cover.

work there involved physical labor, demanding hours, and overtime work—particularly during emergency outages.

### iv.    Family

While working as a volunteer fireman, he met his future wife Jodi, who worked as an EMT with the fire department.  They were married within months and have remained so for nearly 35 years.  They have three children together.  Mastanduno played an active role in raising his children, serving as a cub scout leader for his son's scout troop, volunteering in the local Sea Cadets program,[7] and participating in his children's sports and extracurricular activities, all while working long demanding hours with the power company and fire department.

Their oldest child, Joseph Mastanduno (31), proudly followed in his father's footsteps by both serving in the United States Marine Corp and working for PSEGLI. In his letter of support, Joseph discusses how his father helped him deal with his own struggles upon his return from service and instilled in him the importance of serving others by helping Veterans in need.  *See* Joseph Mastanduno Letter of Support.

His middle daughter, Taylor Mastanduno (25), lives in Florida.  For years Taylor struggled with a debilitating addiction to opioids after first experimenting with the dangerous drugs during her freshman year of college. As this Court is aware, battles with addiction often take a near equal toll on the family members whose loved one's addictions cause their lives to spiral downwards.  In her support letter, she

---

[7] Sea Cadets is the United States Navy's youth development program.  *See generally*, http://www.seacadets.org.

writes that Mastanduno was always supportive in her longstanding struggle to achieve and maintain sobriety.  He would drive her from the halfway house to her doctors' appointments and made sure she attended her AA/NA meetings.  He also volunteered alongside her to help Armed Services Veterans in need, believing that serving others would also aid her own recovery.  She also details how seeing how Mastanduno struggle to cope with his own PTSD helped her battle her addictions. *See* Taylor Mastanduno Letter of Support.

His youngest daughter, Amanda Mastanduno, lives at home with Mastanduno and his wife while she attends college.  In her letter of support, she writes about how when she was a toddler, Mastanduno would work all night and then take care of her during the day while her mom was at work "because he wanted to be a big part of my life."  She describes him today as her "best friend."  *See* Amanda Mastanduno Letter of Support.

Mastanduno's wife of 35 years, Jodi Mastanduno, writes about how devoted  a father he was, observing that "[h]e wanted to be the father figure that he never had and to be there for his children."  *See* Jodi Mastanduno Letter of Support.  She also discusses some of the many instances he has helped others, including driving from New York to Georgia with their son when his "Marine Buddy was in a bad state from PTSD" as well as volunteering to help assist other Veterans in need.  Most recently, before his instant incarceration, Mastanduno, having a CDL license, volunteered to drive church members to various church events and deliver meals to less fortunate members of their community.  *See id.*

13

## v.  Physical and Mental Health

Mastanduno has suffered from a host of physical and mental traumas during his life that have taken a toll on his health and wellbeing.  In the early 90's, Mastanduno was hospitalized after a workplace accident that left him unconscious. He has also been involved in several automobile accidents, including one that resulted with the placement of a metal rod in his neck.  He continues to experience pain and discomfort in his head, neck, and back area.  In total, he has been in four automobile accidents and five work-related accidents.  *See* PSR, ¶ 92.  In 2018, he underwent hip replacement surgery.  PSR, ¶ 96.

Throughout most of his adult life he has suffered from sporadic syncopal seizure-like events, insomnia, and sleep-walking episodes.  On August 11, 2002, while fighting a fire he collapsed due to the onset of a seizure.  On July 28, 2010, he collapsed onto the floor after experiencing acute heart palpitations and tingling in his left arm and chest area.  In 2014, Mastanduno was diagnosed with bradyarrhythmia and syncope, a condition where his heart slows down, failing to pump enough blood through his body, causing him to faint.  *See* PSR, ¶ 97.

In 2017, Mastanduno experienced a psychiatric break when his wife found him wandering around the house mumbling incoherently without any clothes on.  On the advice of his doctor, she took him to Stony Brook University Hospital, where he was hospitalized in the psychiatric unit and treated for major depressive disorder, suicidal ideations, post-traumatic stress, and anxiety disorder.  He was transferred to the VA Hospital where he remained hospitalized for a week for treatment.  Upon his

discharge, he began meeting with an outside therapist and a VA psychiatrist, who have treated him for Mood Disorder, PTSD, and Insomnia. *See* PSR, ¶ 102.

After moving to North Carolina, Mr. Mastanduno established care at the Charles George VA Medical Center and began participating in individual therapy. *Id*.

On September 1, 2021, Mastanduno was hospitalized after passing out again. While in the emergency department, he was observed having episodes of vasovagal syncope with loss of consciousness.

Mastanduno is often only able to sleep for a few hours at a time, and this time is often disrupted by his sleepwalking habit. When he is sleepwalking, Mastanduno is often in a trance-like state and can become easily agitated and aggressive. His wife keeps a stick by their bed that she will use to prod him back to bed safely when he has one of these episodes. She refers to it as her "Tony Stick." She uses this to avoid from being struck by his flailing arms. These episodes increase in frequency and intensity during times of stress.

Since the time he was detained in this matter after his March 6, 2024 plea hearing, Mastanduno has experienced two serious medical episodes while incarcerated at the D.C. Central Detention Facility. On March 25, 2024, Mr. Mastanduno was observed in his cell to be "down exhibiting jerking unresponsive behavior." He was brought to medical where he met with a provider and discussed his prior mental health (PTSD) and his history of vasovagal episodes. After discussions with the provider, he was returned to his unit. On April 1, 2024, Mr.

Mastanduno was observed lying on his bunk and he did not respond to verbal command by jail staff. Jail staff administered Narcan, but Mr. Mastanduno remained unresponsive. Mr. Mastanduno then had, "stiffness and jerking movement of his upper body for about 30-40 seconds." He was then observed hitting himself on his chest and yelling. Jail staff placed him on a stretcher. As EMS transported him from jail to the hospital, Mastanduno began crying and stating something to the effect of, "I asked God to take me out of here" before becoming verbally unresponsive. He was taken to United Medical Center where he was treated for a syncopal episode. He was released later that day and told to follow up with his primary care provider. *See* Defense Exhibit 6 (Excerpt of D.C. Jail Medical Records).

While Mastanduno presents as being in good physical health aside from his syncopal episodes and chronic pain, there is a history of heart disease and cancer in his family. In fashioning an appropriate sentence, Mastanduno asks this Court to consider the lifespans of his immediate male family members. Mastanduno is now 61 years old. All three of his brothers died at or before their early 60's, two of them losing a battle with cancer. *See* PSR, ¶ 79. His father, who suffered from hypertension and cardiovascular disease, lived to be 70 years old.[8] While Mastanduno understands that he chose the latter stage of his life to first engage in criminal conduct, he asks the Court to account for this actuarial information in determining what is a fair and just term of incarceration.

---

[8] Undersigned counsel received Anthony Mastanduno Sr.'s death certificate shortly after PSR objections were due and forwarded it to the PSR writer.

### c. THE NEED FOR THE SENTENCE IMPOSED TO REFLECT THE SERIOUSNESS OF THE OFFENSE, TO PROMOTE RESPECT FOR THE LAW, PROVIDE JUST PUNISHMENT FOR THE OFFENSE, AFFORD ADEQUATE DETERRENCE TO CRIMINAL CONDUCT, PROTECT THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT

While Mastanduno's conduct is undoubtedly serious, so too is the suggested sentence of 14 months in prison for a first-time offender who is 61 years old, with a spotless criminal record, demonstrated history of hard work and steady employment, civic, military, and community service, and whose offense conduct did not injure or physically harm anyone.

As far as deterrence goes, a lengthy sentence is not necessary to deter Mastanduno from reoffending. In addition to the other factors that weigh heavily against the likelihood of Mastanduno engaging in any future criminal conduct whatsoever, including his lack of substance abuse, financial stability, family and community support, both his post-offense conduct, along with his age and criminal history alone strongly suggest his likelihood of reoffending in any way is minimal.

### i.   Post-Offense Conduct

In contrast to many other January 6 defendants, Mastanduno has not posted disparaging remarks about his prosecution, voiced false claims about his conduct, the prosecutor, or this Court. Nor has he attempted to fundraise for being a "political prisoner." Instead, Mastanduno has devoted his time and energies to settling into retirement, working on his property, spending time with his family, and volunteering with his church.

17

### ii.   Age and Criminal History

According to the Sentencing Commission's recent report, "[a]ge exert[s] a strong influence on recidivism across all sentence length categories.  Older offenders were less likely to recidivate after release than younger offenders who had served similar sentences, regardless of the length of the sentence imposed." U.S. SENT'G COMM'N, *The Effects of Aging on Recidivism Among Federal Offenders*, p. 3 (December 07, 2017).[9]  The Commission further noted that for offenders sentenced to terms of imprisonment of one year or more, "**there was no clear association between the length of sentence and rearrest rate**." *Id.* (emphasis added).  Moreover, according to the Commission's data, offenders with a criminal history category of I who are 60 years or older have a rearrest rate of 11.3%.[10]  *Id.* at 25, fig. 22.  By contrast, criminal history category I offenders 30 years old and younger have a rearrest rate of 53%.  *Id.*

[*space intentionally left blank*]

---

[9] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf.

[10] It should be noted that the Criminal History Category I offenders included in this study include both defendant's like Mastanduno who have absolutely no prior record along with those whose prior convictions have aged out or are otherwise not counted for guideline purposes.



**Fig. 22 Rearrest Rate of Recidivism Study Offenders by Criminal History Category and Age at Release**

SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID05_OFFUPDT. The Commission excluded cases from this analysis that were missing information necessary to perform the analysis.

Put plainly, a longer sentence will not provide any specific deterrent value or added protection to the public. Mastanduno has accepted responsibility for his conduct, and unlike many other January 6 defendants, he has not accepted responsibility in Court only to go online and post inflammatory or misleading comments on social media or other platforms, to either minimize his conduct or voice claims of persecution. Rather he has accepted responsibility both inside and outside of the courtroom. He knows that he must bear the consequences for his actions and intends to do so with solemn dignity.

####    d.    The Need for the Sentence Imposed to Provide Anthony Mastanduno with Needed Educational or Vocational Training, Medical Care, or other Correctional Treatment in the Most Effective Manner

This sentencing factor similarly weighs against a lengthy prison sentence as Mastanduno does not need any educational or vocational training. Having worked since the age of 12, most of which involved physical labor that has taken a toll on his body, Mastanduno and his wife are now retired. Given his mental and physical health

issues, the most effective way for him to receive continued treatment is through his own community-based providers.

### e. THE KINDS OF SENTENCES AVAILABLE AND THE SENTENCING GUIDELINE RANGE

In the event this Court applies the § 2A2.2 aggravated assault guideline, Mastanduno nonetheless maintains it is appropriate to also consider the sentencing range produced by the § 2A2.4 (Obstructing or Impeding Officers) that recommends a range of punishment for similar conduct. Like § 2A2.2, § 2A2.4 also accounts for physical contact, a dangerous weapon, and bodily injury. *See* § 2A2.4(b)(1) and (2). As set forth in the defense objections to the PSR, Dkt. No. 41, utilizing the guideline range produced under § 2A2.4 yields a guideline range of 8-14 months, rather than the much higher 63-to-78-month guideline range the Government proposes. *See* Dkt. No. 42 (Government PSR Objections).

Given the vast difference between these guideline ranges, Mastanduno asks this Court to scrutinize the differences and similarities between these two guidelines in considering what is an appropriate sentence. The biggest difference between these two competing guidelines is the application of the 6-level official victim enhancement. Under § 2A2.2, the enhancement applies. But under § 2A2.4, it does not. According to the commentary, the base offense level itself "incorporates the fact that the victim was a governmental officer performing official duties." § 2A.4, comment., n. 1. Relatedly, there is a four-level difference in the base offense level between these two guidelines.

The difference between these two guideline ranges is a 10-level swing, or a

difference between **8 to 14 months** and **46 to 57 months**, before any multi-count grouping adjustment is applied.[11]  Should the Court accept both the Government's argument regarding the application of § 2A2.2 and adopt its position on grouping, the final guideline range would be **63 to 78 months**.

So, the question then becomes:   If Mastanduno's assaultive conduct is deemed to be aggravated because it "involved … an intent to commit another felony" under § 2A2.2,[12] does this mean that his punishment should be increased by roughly five additional years?  Put differently, in the event this Court finds that Mastanduno's § 111(b) convictions were committed in furtherance of his § 231 conviction, the question seems to be:  Does the fact that Mastanduno's acts of assaulting, resisting, opposing, impeding, intimidating, or interfering with an officer(s) engaged in the performance of their official duties with a dangerous weapon (111(b) counts) also involved committing acts with the intended purpose of obstructing, impeding, or interfering with an officer or officers engaged in their official duties incident to and during a civil disorder (§ 231 count), justify around five additional years of incarceration, **when the acts themselves are one and the same**?  Mastanduno maintains it does not.

---

[11] At the time of this filing, both parties and the PSR writer have different positions on the grouping analysis.  Mastanduno maintains all counts of conviction should be treated as one group, the government argues there are three groups of closely related counts, and the PSR writer asserts there are two groups of related counts for guideline purposes.

[12] While the PSR accurately defines the four ways in which an assault can be elevated to an aggravated assault under the guidelines, it does not identify which of these grounds apply to Mastanduno's conduct.  Mastanduno anticipates the government will rely on the intent to commit another felony grounds and has tailored his argument accordingly.

Both Judge Amy Berman Jackson and Judge Reggie B. Walton made similar observations when considering the similarities and differences between § 2A2.2, § 2A2.4, and the disparate outcomes they produce. In *United States v. Hamner*, 21-CR-689, Dkt. No. 67, Sent. Hr'g Tr. at 23 (D.D.C. 2024), Judge Jackson observed, "you've got two guideline calculations for the same set of facts … that produce a 46-month – or almost four-year difference on the low end and a 57-month … difference on the high end[.]"[13] *See also*, *United States v. Riley Williams*, 1:21-cr-000618, Dkt. No. 150, Sent. Hr'g Tr. at 13 (D.D.C. 2023) (Jackson, J.) (observing "significant disparity [between § 2A2.2 and § 2A2.4] for the same conduct against federal officers" before ultimately declining to impose the cross-reference to § 2A2.2 as a matter of lenity). Judge Reggie B. Walton reached a similar conclusion in *Wren*, concluding that U.S.S.G. § 2A2.4 rather than § 2A2.2 applied to Wren's 18 U.S.C. § 111(a) conviction (pushing against a police officer's riot shield) notwithstanding his 18 U.S.C. § 231 conviction. *United States v. Donnie Wren*, 21-cr-00599, Dkt. No. 187, Sent. Hr'g. Tr. at 30 (D.D.C. 2023).[14]   In the end, Judge Wren sentenced Mr. Wren to one year plus one day of imprisonment after his § 111(a), § 231(a)(3), and § 1752(a)(1) convictions. *See id.* at 173 (Judgment).   Like Mr. Wren, Mastanduno's assaultive conduct was

---

[13] In *Hamner*, the government requested a sentence of 60 months. *See id.*, Dkt. No. 28 (Gov't Sent. Memo). Ultimately, Judge Jackson imposed a sentence of 30 months. *Id*. at 65 (Judgment). Hamner's conduct included (1) tearing down barricades on the west lawn to allow other rioters through; (2) pulling down a fence; (3) engaged in a tug of war over a metal barrier with police officers; and (4) helping others use a billboard as a battering ram against officers. Hamner was also a CHC V. *See id.*, Dkt. No. 28 (Gov't Sent. Memo).

[14] In *Wren*, the government argued the "intent to commit another felony" basis as grounds for applying § 2A2.2. *See id.* at Dkt. No. 158, at 16 (Gov't Sent. Memo).

relatively brief and did not result in any injuries.  Mastanduno's use of force, albeit with a baton and mop handle, arguably involved a lesser degree of force than that of Mr. Wren's.  At a minimum, their actions against the police officers represent a close parallel.[15]

In sum, should this Court calculate Mastanduno's guidelines under § 2A2.2 rather than § 2A2.4, he asks this Court to consider the drastic differences between these guideline ranges produced by these two competing ranges as a ground for a downward variance in view of the similar, overlapping conduct they account for.

### f. THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES AMONG DEFENDANTS WITH SIMILAR RECORDS WHO HAVE BEEN FOUND GUILTY OF SIMILAR CONDUCT

Any disparity between the proposed sentence and the sentence produced by the § 2A2.2 guideline is warranted by the unique characteristics of this case, which include Mastanduno's otherwise law-abiding lifestyle, work history, civic, military, and community service, his post-offense conduct, and exceedingly low risk of recidivism.  It is also warranted by the brief nature of his felony conduct that is measurable in seconds coupled with the fact that he did not intend to injure, nor did he injure anyone other than himself on January 6, 2021.

### III. CONCLUSION

Counsel has submitted several letters of support on behalf of Mastanduno's friends, former co-workers, firefighters, and family members.  These personal insights shed important light on who Anthony Mastanduno is.  Collectively, these

---

[15] *See id.* at Dkt. No. 158, at 7 (photo of Wren pushing against riot shield).

letters from those whose lives have been directly impacted by Mastanduno demonstrate the many admirable qualities he has displayed throughout the course of his life, including his loyalty, hard-working nature, selflessness, and devotion to his family, country, and community.  Mastanduno asks that this Court consider these insights alongside his misguided conduct on January 6, 2021, in fashioning a fair and just sentence.

Section 3553(a)'s parsimony clause instructs that a sentence shall be sufficient, but not greater than necessary to satisfy the statutory purposes of sentencing.  The proposed sentence of 14 months of incarceration is sufficient punishment.  The six-year sentence the government requests is excessive.  Mastanduno recognizes that he deserves to be punished.  But he also deserves a sentence that is proportional to his actual conduct.  Should the Court impose the proposed sentence, he will miss a years' worth of birthdays, holidays, and other milestones, as well as time away from the retirement he and his wife have worked their whole lives to enjoy.  In view of all the circumstances of his offenses of conviction alongside a lifetime's worth of being a responsible, productive, service-oriented, law-abiding member of society, the proposed sentence of 14 months of incarceration is ample punishment in this matter.

Dated:  June 20, 2024                    Respectfully Submitted,

                                         s/**Rhett H. Johnson**
                                         Rhett Hunter Johnson
                                         W.Va. Bar #12114
                                         N.C. Bar #35365 (inactive)
                                         Assistant Federal Public Defender
                                         Federal Public Defender for the
                                         Western District of North Carolina
                                         1 Page Avenue, Suite 210
                                         Asheville, NC 28801
                                         Phone: (828) 232-9992
                                         Fax: (828) 232-5575
                                         E-Mail: Rhett_Johnson@fd.org